IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                    Plaintiff,

     v.

TAQUARIUS KAREAM FORD,

                 Defendant.

No. 3:14-cr-00045-1-HZ

OPINION & ORDER

Leah K. Bolstad
Kelly A. Zusman
U.S. Attorney's Office, District of Oregon
1000 SW Third Ave., Ste. 600
Portland, OR 97204

Glen H. Ujifusa
Multnomah County District Attorney's Office
600 Multnomah County Courthouse
1021 SW Fourth Ave.
Portland, OR 97204

       Attorneys for Plaintiff

//

OPINION & ORDER – 1

Laurie Bender
Laurie Bender, PC
735 SW First Ave., 2nd Floor
Portland, OR 97204

      Attorney for Defendant


HERNÁNDEZ, District Judge:

      Defendant Taquarius Kareem Ford is charged with three counts related to his alleged

involvement in sex trafficking, including two counts of sex trafficking by force, fraud, and

coercion. Ford has a number of pretrial motions currently pending, including a motion for

dismissal or for bill of particulars, a motion to produce Jencks Act materials, a motion to

suppress evidence seized from hotel room in 2012, a motion to suppress evidence found pursuant

to several search warrants, and a motion to dismiss because, he argues, the charging statute 15

U.S.C. § 1591, is unconstitutionally vague.[1] The Court held an evidentiary hearing on June 29,

and heard oral argument on July 8 of 2016. After reviewing the testimony and the submitted

evidence, and carefully considering the parties' arguments, the Court denies Ford's motions.

      First, the Court addresses Ford's standing to bring a motion to suppress evidence from a

hotel room not registered in his name—Ford had a reasonable expectation of privacy in the

room, but it ended when hotel staff took affirmative steps to evict he and Prinster from the hotel.

However, Ford does at least having standing to challenge the seizure of his personal laptop

computer from that room. In any event, even if Ford had standing to challenge the seizure of all

of the evidence, his motions to suppress would still be denied. Ford's presence in a hotel room

where officers had reasonable suspicion (if not probable cause) to believe prostitution activity

was occurring gave them reasonable suspicion to detain him and investigate his involvement.

---

[1] Ford also moved for an order allowing discovery on the issue of selective enforcement and prosecution.
Def. Mot. for Discovery, ECF 169. That motion is addressed is a separate Opinion & Order.

That suspicion quickly ripened into probable cause to arrest Ford for attempted compelling prostitution when one of Ford's alleged victim's emerged from a neighboring room and provided police with further details about Ford and Prinster's sex trafficking activities. Officers then lawfully seized, without further searching, Ford's laptop computer, numerous cell phones, cameras, and other electronic devices.

The search warrants Ford challenges are supported be ample probable cause, established a reasonable nexus between the seized computers, phones, and other electronic devices to the alleged crime, and described with reasonable particularity what officers should look for when searching those devices. To the extent the warrants may have had technical deficiencies, officers acted upon the warrants with good faith, and therefore suppression is not warranted.

Ford's void for vagueness motion is denied without prejudice because it is premature. A vagueness challenge to a statute that does not implicate the First Amendment must be examined "as-applied," which in turn requires the fact-finder to determine the facts from the admitted evidence and testimony heard at trial.

Ford's motion for a bill of particulars is denied because the second superseding indictment tracks the statutory language, and the Government's disclosures have provided Ford ample opportunity to prepare a defense.

Finally, Ford's motion for immediate production of <u>Jencks</u> Act material—specifically, grand jury testimony—is denied because he has not made a sufficient showing of a compelling need that outweighs the interest in keeping those proceedings secret. The Government shall, however, disclose such testimony three weeks before trial.

//

//

BACKGROUND

There is a Hampton Inn in northeast Portland, Oregon near the airport.[2] The Port of Portland police have jurisdiction over the airport and the surrounding area, including the Hampton Inn and a handful of other hotels. From time to time, the hotels' employees have to call the police to evict problematic guests. Around 2:15 p.m. on February 17, 2012, Port of Portland police officer Jason McKay received such a call from dispatch: employees at the Hampton Inn were having trouble removing several people who had overstayed in a pair of rented rooms, and had requested police assistance. The employees also reported that they suspected prostitution activities in connection with the rooms. While enroute, Officer McKay received from dispatch a link to an online news article that hotel staff had discovered when investigating the guest registered to the rooms in question, co-defendant Konia Prinster. According to the article, Prinster was arrested in 2010 near Louisville, Kentucky, and charged with loitering for prostitution purposes and possession of a fake military identification card she used to get a discounted rate at a hotel in the area. Local law enforcement officers told the reporter that Prinster was a known prostitute who advertised on a website offering adult escort services.

Officer McKay arrived at about the same time as Port of Portland police officer Bruce Rector, who had also responded to the call. The two met with the Marshal McCormack, the hotel manager who made the call. Mr. McCormack told the officers that the guests in rooms 209 and 211 had overstayed the checkout time by over two hours. He also suspected the guests were engaged in prostitution. McCormack watched numerous people come to the hotel, visit the rooms in question, and leave quickly. Just prior to the officer's arrival, McCormack saw a tall, white male enter the hotel lobby, withdraw cash from the lobby ATM, and walk towards the

---

[2] The Court heard testimony and received evidence related to Ford's various motions at hearings on June 30 and July 6 of 2016. What follows is a summary of the Court's factual findings based on its evaluation of the credibility of the witnesses' testimony and the probative value of the evidence submitted.

rooms. McCormack followed and, as expected, the man went into room 211. McCormack listened through the closed door: "We have to make this quick," a female said. "I was supposed to be out of here at noon." Moments later, McCormack told the officers, he heard them having sex. He also showed Officers McKay and Rector the news article that he found about Prinster's previous prostitution investigation in Louisville.

The three of them went to the rooms to evict Prinster and her guests. The two officers flanked the manager on each side of the door to room 209. Someone knocked; neither officer could remember whom. McKay said that, in his experience, the hotel manager would typically knock, then step back and let the officers move up to talk with the soon-to-be-evicted guests.

Ms. Prinster opened the door wearing a towel. The officers testified that they could see past her into the room. Mr. Ford was working on a laptop computer at a desk behind her, near the back of the room. Prinster and the hotel manager briefly talked at the threshold of the room about her overstay. One of the officers called Ford to the door. Ford testified that he came to the door voluntarily when he heard the manager speaking to Prinster with a raised voice. When asked, Ford produced a Florida driver's license. He told the officers he was there to give Prinster a ride.

Officer McKay patted Ford down and found a large stack of cash, later counted as $3,445, in Ford's pocket. Officer McKay set the money on the counter in the bathroom, near the front door to the room. Moments later, a girl appeared from room 211 and approached Officer Rector, who was standing in the hallway outside of room 209. Rector said she was young and scared, and that she just stared at him until Rector asked who she was. She told the officer her name (in this Opinion & Order, she is identified as "T.H."), and she produced an Idaho driver's license and a Boise State University identification card. She was eighteen.

Both officers suspected prostitution activity in Prinster's rooms. They suspected Ford was involved, though he did not act like a typical buyer or "John" that the officers had encountered in the past—surprised, embarrassed, and moving quickly to re-clothe. Officers McKay and Rector were now outnumbered, and the officers did not know if more people were in room 211. McKay handcuffed Ford, and explained that he was being detained while the officers continued to investigate. Rector stayed with Ford and Prinster in room 209, while McKay took T.H. to room 2011 to conduct an interview.

T.H. told Officer McKay that she had met Ford and Prinster a year or two prior at a mall in Idaho; the pair had promised her help in starting a modeling career, and they had kept in contact with her though Facebook. Eventually, Ford and Prinster sent T.H. a plane ticket to Portland, where they met her and the three traveled to California then back to Portland. Prinster rented the two rooms at the Hampton Inn. T.H. stayed in room 211. Occasionally, Prinster would come to the room and tell T.H. to leave while Prinster met with a client to discuss some business matters. One time, T.H. told McKay, she came out of the shower in room 211 and saw Prinster having sex with a man. T.H. also said that Ford had taken photos of her—initially of her face, but the pictures progressed to more erotic and even topless poses. Her parents warned her, she said to McKay, about Ford and Prinster, and she teared up. Officer McKay called and spoke to T.H.'s mother, who stated that she was familiar with Ford and Prinster and believed that they were "grooming" T.H. for sex work. T.H. then told Officer McKay that she had given Ford all of her money, and that Ford had control of her vehicle in California. She was thankful the officers were there, and said she wanted to help with the case however she could. But mostly, she told Officer McKay, she wanted to go home.

Officer McKay returned to room 209, where Officer Rector had spoken with Prinster and Ford. Prinster told Officer Rector that she and T.H. were friends, that she had bought her a plane ticket to Portland, and that the two were hanging out and had partied the night before. Prinster said that the male who had come up to visit before the police arrived owned a plumbing business and that she was going to design a website for him. She couldn't recall his last name. Officer Rector then *Mirandized* Ford and asked for his story. Ford said he was in Portland looking for office space for his expanding public relations business. He had stayed the night before at the downtown Marriott and he planned to stay at a friend's house later that night. Rector asked how he knew Prinster and T.H.; Ford explained that he had known Prinster for some time, and that he met T.H. online. Ford then declined to speak any further.

Officers McKay and Rector met briefly to discuss what they had learned, and decided to call for detectives to assist in the investigation. Roughly an hour after the hotel manager made his initial call to police, Detective Romero Martinez and his partner, Detective Osorio, arrived on the scene. Officers McKay and Rector briefed the detectives on what they had learned so far, and the detectives then spoke with T.H. She expanded the basic story she told Officer McKay with more detail. She said that Prinster had numerous client meetings in room 211 during which T.H. was told to leave the room; however, Prinster at one time told T.H. that, to prove her "loyalty," she would have to watch Prinster have sex with another man. T.H. said that Ford and Prinster introduced her to other girls in Portland who also believed they were going to be models. And T.H. described Ford's violent conduct, including that Ford had been very physical with her during sex, and another incident where Ford grabbed Prinster by the throat during an argument. T.H. told Detective Martinez that Ford had taken erotic pictures of her and that he had them on his laptop and camera.

OPINION & ORDER – 7

Detectives Martinez and Osorio suspected that Ford and Prinster could have been involved in a sex trafficking ring, and they contacted an officer with the Portland Police Bureau's sex crimes and human trafficking unit, Sergeant Geiger. Based on Sgt. Geiger's advice, the detectives began seizing evidence from the room, including computers, phones, cameras, and other electronics. Officer McKay arrested Ford for attempted compelling and promoting prostitution, and he was booked later that day.

Detective Martinez continued his investigation into Ford and Prinster. He found online advertisements for adult escort services featuring both Prinster and T.H. A few days later, on February 21, 2012, T.H.'s mother contacted Detective Martinez. She reported that T.H. had more information to provide, but would be more comfortable talking with a female officer. Officer Gossman from the Portland Police Bureau then conducted another interview with T.H., and Gossman shared that information with Detective Martinez. Not only did T.H. watch Prinster have sex with client in room 211 on February 17, but Prinster gave her a condom and told her to participate, or Ford would be mad. T.H. also said that Ford had slapped, choked, and raped her, had taken control of her car, and had set up meetings between her and strange men posing as photographers (though none of them had camera equipment) whom T.H. would have to please to "work her way up" to become a model.

On March 2, 2012, Detective Martinez submitted a state search warrant application to Multnomah County Circuit Judge Kathleen Dailey requesting authorization to search the electronic devices officers seized from Prinster's hotel room when they arrested Ford. Def. Ex. 101 ("2012 Search Warr. Aff."). Detective Martinez detailed the facts he had uncovered, and described his experience in sex trafficking investigations, including the ways traffickers ensnare victims and the tools of the trade the traffickers use to promote and protect their business. Judge

Dailey authorized the search warrant for the seized devices, and officers executed the warrants between March 2 and March 16 of 2014. Def. Ex. 102.

Ford was later released, but law enforcement retained custody of his seized laptop and cell phones. Gov't Resp. to Mot. to Suppress at 12, ECF 178. On January 29, 2014, the Government filed the initial indictment against Ford and Prinster; Ford was arrested in Miami, Florida in February of 2014. At that time, federal agents seized additional electronic evidence, and then subsequently searched those items pursuant to a new federal search warrant. Ford has been in custody since. Id.

Currently before the Court are a number of pretrial motions. After dispensing with an evidentiary issue, the Court will examine the motions in the following order:

1.  Ford's Motion to Suppress for Lack of Probable Cause, ECF 167;

2.  Ford's Motion to Suppress Evidence Pursuant to Search Warrants, ECF 164;

3.  Ford's Void for Vagueness Motion, ECF 173;

4.  Ford's Motion for Dismissal, or in the alternative, a Bill of Particulars, ECF 160; and

5.  Ford's Motion to Produce Jenks Act Material, ECF 161.

The Court reserves ruling on Ford's Motion in Limine, ECF 172.[3]

DISCUSSION

## I.      Prinster Declaration

The Court first addresses a preliminary evidentiary issue. At the hearing on June 30, 2016, Ford introduced a transcript of a recorded interview between an investigator hired by his attorney and co-defendant Prinster before Prinster had secured independent counsel. At the subsequent hearing on July 6, 2016, the Government sought to introduce a declaration from

---

[3] As previously mentioned, Ford's Motion for Discovery on the Issue of Racial Profiling, Selective Prosecution and/or Enforcement, ECF 169, is addressed in a separate Opinion & Order.

Prinster explaining the context of her interview with Ford's investigator. Ford's attorney objected on the basis of relevance. Gov't Ex. 3. The Court reserved ruling on Ford's objection at the time, and now overrules it. Because the declaration offers factual context about the communications between Ford and Prinster regarding Prinster's interview with Ford's investigator it is relevant and admissible.

## II.    Motion to Suppress for Lack of Probable Cause

Ford has two pending motions to suppress which the Court will separately address. In this first motion, Ford seeks to suppress all evidence seized and searched on February 17, 2012, at the Hampton Inn, and any evidence derived from or discovered as a result of those searches and seizures. Ford asserts that law enforcement officers entered the hotel room where he and Prinster were staying, arrested them, and searched and seized their personal effects without probable cause. Def. Memo. In Support of Mot. to Suppress, Lack of Probable Cause ("Def. Mot. to Supp. I") at 1–2, ECF 168.

### A.  Ford's Standing in Room 209

The first issue to resolve is whether Ford has standing to challenge the seizure of evidence from room 209. The Government contends that Ford does not have standing in room 209 because it was registered to Prinster, and Ford told police he had been in the room for a short time. Gov't Resp. to Mot. to Supp. at 14–17. Thus, the Government argues, Ford was merely a temporary guest in room 209, and is not entitled to the Fourth Amendment's protections for evidence seized there. Id. at 15 (citing Minnesota v. Carter, 525 U.S. 83, 90 (1998) ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").

"[A] person seeking to exclude evidence allegedly obtained in violation of the Fourth Amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence." United States v. Pulliam, 405 F.3d 782, 786 (9th Cir. 2005). To establish standing, the defendant must prove he had a reasonable expectation of privacy in the place searched or the item seized. United States v. Caymen, 404 F.3d 1196, 1199 (9th Cir. 2005). It is well-settled that "[t]he Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms." United States v. Cormier, 220 F.3d 1103, 1108–09 (9th Cir. 2000) (citation omitted). "To invoke the protections of the Fourth Amendment, a person must . . . demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was one that society is prepared to recognize as reasonable." United States v. Bautista, 362 F.3d 584, 589 (9th Cir. 2004) (citation omitted); see also United States v. Dorais, 241 F.3d 1124, 1128 (9th Cir. 2001) ("[T]o have standing to challenge the search of a hotel room under the Fourth Amendment, a defendant must establish a reasonable expectation of privacy in the room.") (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)).

"[M]ere presence in the hotel room of another is not enough" to establish Fourth Amendment standing. United States v. Grandstaff, 813 F.2d 1353, 1357 (9th Cir. 1987). However, "a guest who stays overnight and keeps personal belongings in the residence of another might have a reasonable expectation of privacy." Id. (citing United States v. Echegoyen, 799 F.2d 1271, 1277 (9th Cir. 1986); United States v. Salvador, 740 F.2d 752, 755 n.2 (9th Cir. 1984)). The Court finds that Ford had a reasonable expectation of privacy in room 209. Officer Rector testified that when he first spoke to Ford near the door to room 209, Ford told the officers that he had arrived at the room about fifteen minutes prior and was there to give Prinster a ride.

Ford, however, testified that he had actually arrived at room 209 in the early morning hours and had slept there. In his 2012 search warrant affidavit, Detective Martinez wrote that T.H. told him Prinster had "reserve[d] two rooms at the Hampton Inn, one for [T.H.] and the other for both Prinster and Ford." 2012 Search Warr. Aff. at 9. T.H. also told Detective Martinez that, prior to the police encounter on February 17, 2012 she, Prinster, and Ford had left the downtown Marriott Hotel room after partying together and returned to the Hampton Inn. Id. at 10. Detective Martinez also wrote that he found "Prinster's, Ford's, and [T.H.]'s suitcases and personal items laid throughout . . . room [209]." That corroborates Ford's testimony about his interest in room 209 at the Hampton Inn. He was more than a temporary guest; he shared the room with Prinster, slept there, and had his luggage and personal laptop there. That is sufficient to establish Ford's reasonable expectation of privacy in the room. See Grandstaff, 813 F.2d at 1357 (denying standing for a defendant present in a hotel room registered in co-defendant's name where defendant did "not show[] that he shared [the] room, stayed there overnight or even that he had his luggage there.")

The analysis does not, however, stop there. The Government asserts that Ford's expectation of privacy ended when hotel management took affirmative steps to evict him and Prinster from the room. Gov't Resp. to Mot. to Supp. at 17. "[W]hether a hotel patron retains a reasonable expectation of privacy in his hotel room depends on "whether or not management had justifiably terminated the patron's control of the room through private acts of dominion." United States v. Cunag, 386 F.3d 888, 895 (9th Cir. 2004) (citation and quotation omitted).

Officers McKay and Rector testified that on February 17, they received a dispatch call from the Hampton Inn requesting police assistance in evicting the occupants of rooms 209 and 211. Officer McKay testified that he remembered the dispatch call reporting that the employees

were "having difficulty" or "were unsuccessful" in their attempts to evict the occupants to that point, though neither officer knew any specific steps hotel management took to repossess the rooms prior to calling the police. Both officers believed that Prinster was past her check out time when they arrived on the scene at approximately 2:15 p.m.. The officers accompanied the hotel manager, Mr. McCormack to the door of room 209, and both Officers McKay and Rector understood that they were there to assist the manager in evicting the people in rooms 209 and 211, not only because they were past checkout time, but also because hotel employees suspected the occupants were engaged in illegal prostitution activities. After Prinster answered the door, both officers testified that Prinster was informed that she was past her check out time and that she needed to vacate the rooms. Ford testified that he overheard the hotel manager tell Prinster in a loud voice that she had to check out, and "had to go right now."

Ford's expectation of privacy in room 209 ended with these "clear and unambiguous" signs of eviction. United States v. Young, 573 F.3d 711, 716–17 (9th Cir. 2009); see also Cunag, 386 F.3d at 895 (holding that "[l]ocking out [the defendant] and the room's occupants in conjunction with registering a crime report with the police certainly" qualified as a clear and unambiguous sign of eviction); Bautista, 362 F.3d at 590 (finding that defendant's expectation of privacy continued, in part because "the manager did not ask the police to evict" him).

One final wrinkle remains. Even though Ford's expectation of privacy in the room had expired, he has standing to separately challenge the seizure and search of his personal laptop computer. Both officers testified that, when they first saw into room 209 after Prinster opened the door, they saw Ford sitting at a table or desk near the back of the room, working on the laptop. The computer was, in other words, in Ford's possession and being used by him at the time of the encounter. That is sufficient to show a reasonable expectation of privacy in his

OPINION & ORDER – 13

computer. See United States v. Heckenkamp, 482 F.3d 1142, 1146 (9th Cir. 2007) ("Individuals generally possess a reasonable expectation of privacy in their home computers.") (quoting United States v. Lifshitz, 396 F.3d 173, 190 (2d Cir. 2004)); see also United States v. Lisk, 522 F.2d 228, 230 (7th Cir. 1975) (finding that a defendant's ownership of an item found in the trunk of a third party's car was sufficient to confer standing to challenge the seizure of said item); United States v. King, 560 F. Supp. 2d 906, 914 (N.D. Cal. 2008) (separately analyzing the defendant's standing in hotel room and as regards a seized personal laptop computer).

### B. Merits

Having established Ford has standing to challenge the seizure of his computer, the Court turns now to the merits of Ford's motion to suppress. As mentioned above, Ford argues that officers entered the hotel room where he and Prinster were staying, arrested them, and searched and seized their personal effects without probable cause. The Court disagrees. Officers had reasonable suspicion to detain Prinster and Ford at the threshold of room 209 to investigate suspected prostitution activities. During that investigation, especially once T.H. emerged from the neighboring room and provided further information about Ford and Prinster's criminal activities, officers developed ample probable cause to arrest Ford for attempted compelling prostitution. Officers were then justified in seizing incident to arrest Ford's computer and other personal items such as phones, cameras, and digital storage devices because they reasonably believed those items contained evidence of the crime.[4]

The Fourth Amendment protects against unreasonable searches and seizures by the government. U.S. Const. Amend. IV; Elkins v. United States, 364 U.S. 206, 213 (1960)

---

[4] Even if Ford's reasonable expectation of privacy in the room had not expired, i.e., if the Court assumes Ford's standing to challenge all seized items, the officers had reasonable suspicion to detain him and investigate for criminal activity, which ripened into ample probable cause to arrest him for attempted compelling prostitution, and suppression would not be warranted.

(applying Fourth Amendment protections to states and state actors through Fourteenth Amendment). A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). Courts must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)).

During the ensuing brief investigation, those founded suspicions can "ripen into probable cause as police discover additional facts or as incidents occur after the stop." People of Territory of Guam v. Ichiyasu, 838 F.2d 353, 357 (9th Cir. 1988) (citation omitted). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)); see also United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986) (defining probable cause: "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.").

When Officers McKay and Rector accompanied Mr. McCormack to the door of room 209, they reasonably suspected the occupants were engaged in illegal prostitution. Mr. McCormack gave the officers first-hand observations of prostitution activity connected with Prinster's rooms. Specifically, he observed numerous unregistered males visit the rooms registered to Prinster, including one who withdrew money from the hotel lobby cash machine

OPINION & ORDER – 15

prior to entering the room. Mr. McCormack followed one of the visitors to Prinster's room, and through the closed door, he heard a female say "we were supposed to be out of here at noon, we have to make this quick." Mr. McCormack then heard them having sex. Officer McKay had received a news article from dispatch showing a picture of Prinster and describing her 2010 arrest for prostitution in Kentucky. And Mr. McCormack's information was corroborated when Prinster, a known prostitute and the main suspect, answered the door. At that point, officers had at least reasonable suspicion to detain Ms. Prinster and investigate further, if not probable cause to arrest her for prostitution.

As to Ford, the officers first learned of his presence when Prinster opened the door to room 209 in response to the knock. Although it was not clear from the testimony whether the police or the hotel manager knocked on the door, the evidence does reflect that there was simply a knock; officers did not demand that it be opened or that the occupants take any action. See United States v. Perea-Rey, 680 F.3d 1179, 1187 (9th Cir. 2012) (affirming that an officer's "knock and talk" approach to a residence does not violate Fourth Amendment); United States v. Winsor, 846 F.2d 1569, 1573 (9th Cir. 1988) (finding no search where "the police did what any person could do—they knocked on the front door of a residence, but did not use their authority as police officers to command the occupants to open the door."). Both officers testified that they could see through the now-open door and observed Ford in the back of the room using his laptop computer. Both officers testified that they suspected Ford was involved in criminal activity, as he was present in a room registered to a known prostitute and connected to prostitution activity. He was actively using a laptop, one of the known tools of the sex trafficking trade used for advertising and soliciting business through online forums like Craigslist and Backpage.com. Ford then voluntarily came to the door—the officers testified they asked Ford to come to the

door and he complied, while Ford testified that he came to the door on his own volition before he

knew that police officers were present. At this point, officers had reasonable suspicion to detain

Ford at the threshold of the door to room 209 to investigate his connection to the prostitution

activity. See United States v. Holder, 990 F.2d 1327, 1329 (D.C. Cir. 1993) (finding "ample"

probable cause existed to arrest defendant who was present in private apartment involved in

narcotics: "[t[he logical inference for the police to draw . . . was that [defendant] was either a

party to the distribution of drugs or a customer who had just made, or was about to make, a

purchase.").

Officer McKay then proceeded to frisk Ford at or immediately inside the door of room

209.[5] Mere moments after Officer McKay completed the pat down of Ford, T.H. emerged from

room 211 and approached Officer Rector, and the nature of the encounter changed significantly.

Officers were now outnumbered; out of a reasonable concern for officer safety, Officer McKay

handcuffed Ford and informed him that he was being detained while the officers investigated

further. Officer McKay then briefly interviewed T.H. in room 211, and developed ample

probable cause to arrest Ford for attempted compelling prostitution. He learned that Ford and

Prinster used the promise of a modeling career to convince T.H. to travel from Idaho to meet

them in California and travel to Oregon, and Officer McKay knew that such a scheme was a

common one sex traffickers use to lure victims into sex work. Officer McKay learned that Ford

had taken erotic and nude pictures of T.H. and that Ford had them on his laptop and camera. He

learned that Ford had taken control of T.H.'s money and vehicle, and that Ford had been violent

with her. T.H also confirmed that Prinster had recently had sex with an unknown man in one of

---

[5] Officer McKay testified that Ford consented to the Frisk; Ford denied that he gave consent. The
Government concedes that Officer McKay's frisk exceeded the allowable scope of the investigative stop.
The Court does not rely on the evidence found on Ford during that pat down to conclude that officers had
reasonable suspicion to detain Ford and developed probable cause to arrest him.

the rooms. When speaking with T.H. in room 211, Officer McKay observed a used condom in the trash.

Under the totality of the circumstances, a reasonable and prudent officer could believe that there was a fair probability that Ford was involved in criminal activity, and thus Officer McKay had probable cause to arrest Ford for attempted compelling prostitution. United States v. Valencia-Amezcua, 278 F.3d 901, 906 (9th Cir. 2002) ("There is no doubt that police may arrest a person without a warrant if the arrest is supported by probable cause.) (internal quotation marks and citations omitted).

Which brings the Court to Ford's computer, phone, and other electronic devices seized, though not yet searched, by police from room 209. When the officers lawfully arrested Ford for attempted compelling prostitution, they reasonably suspected that these items contained evidence of criminal activity. Officers observed Ford using the laptop in a room connected with prostitution activities, and the officers knew that, based on their training and experience, sex traffickers often used laptops and smart phones to solicit business in online forums and to communicate with customers. T.H. told officers that Ford took nude and erotic pictures of her and that she believed Ford stored those pictures on his camera and computer. She also told officers that Ford and Prinster communicated with her on Facebook when trying to lure her from Idaho. Thus, officers were justified in seizing these items to prevent destruction of incriminating evidence while they sought a warrant to search them. Riley v. California, 134 S. Ct. 2473, 2486 (2014) (holding that police may seize a cell phone "to prevent destruction of evidence while seeking a warrant"); Texas v. Brown, 460 U.S. 730, 749–50 (1983) ("[I]f there is probable cause to believe [a container] contains contraband . . . [t]he item may be seized temporarily" while officers seek a warrant to search it).

OPINION & ORDER – 18

Ford's motion to suppress evidence seized from room 209 for lack of probable cause is

denied.

### III.    Motion to Suppress Evidence Seized Pursuant to Search Warrants

Ford separately moves to suppress evidence seized pursuant to search warrants on March

2, 2012, April 25, 2014, and March 9, 2015, and all fruits of those searches. Def. Mot. to

Suppress Evidence Pursuant to Search Warrants ("Def. Mot. to Supp. II"), ECF 164. Ford

broadly asserts that evidence derived from searches performed pursuant to all three warrant

should be suppressed because the warrants were based on unlawful police conduct, to wit, his

initial contact with Port of Portland police at the Hampton Inn in February of 2012. Next, he

attacks the 2012 search warrant as constitutionally defective because it lacked probable cause.

Finally, he argues that the search of the seized evidence exceeded the scope of the warrants.

As an initial matter, the Court explained at length above why the police did not act

unlawfully during the encounter at the Hampton Inn. Thus, Ford's attack on the search warrants

based on allegedly unlawful police actions in investigating and arresting Ford or searching room

209 is not grounds for suppressing evidence found pursuant to those warrants. Ford's other

arguments are addressed below.

### A.  March 2, 2012 Warrant

Ford argues that the March 2, 2012 search warrant signed by Judge Dailey lacked

probable cause because it failed to sufficiently describe the nexus between the items seized with

the suspected criminal sex trafficking activity. "To be valid, a search warrant must be supported

by an affidavit establishing probable cause." Cameron v. Craig, 713 F.3d 1012, 1018 (9th Cir.

2013) (internal quotation marks omitted). "Probable cause exists where, under the totality of the

circumstances, a reasonable officer has occasion to believe that the search will uncover evidence

OPINION & ORDER – 19

relating to a suspected crime." Id.; see also United States v. Fries, 781 F.3d 1137, 1150 (9th Cir.

2015) ("Probable cause for a search requires a fair probability that contraband or evidence of a

crime will be found in a particular place, based on the totality of the circumstances.") (internal

quotation marks omitted).

The probable cause standard requires only a "fair probability" that contraband or

evidence is located in a particular place. United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir.

2007) (citing Illinois v. Gates, 462 U.S. 213, 246 (1983); United States v. Gourde, 440 F.3d

1065, 1069 (9th Cir. 2006) (en banc)). "Whether there is a fair probability depends upon the

totality of the circumstances, including reasonable inferences, and is a commonsense, practical

question." Id. (internal quotation marks omitted). "Neither certainty nor a preponderance of the

evidence is required." Id.

Subsequent to Ford's arrest in Portland in 2012, Detective Martinez submitted an

affidavit in support of a search warrant to search the items seized from room 209 of the Hampton

Inn on February 17, 2012. 2012 Search Warr. Aff. at 1–14. Judge Dailey signed the warrant on

March 2, and authorized law enforcement to search and analyze the following items:

1. RM001; 1 LG cell phone Virgin Mobile;
2. RM002; 1 "Blackberry" cell phone Virgin Mobile;
3. RM003; 1 Cannon Powershot Camera A2200;
4. RM004; 1 HP Black Laptop computer (serial #5CA0375904);
5. RM005; 1HP Flash drive ;
6. RM006; 1 White I-Phone;
7. RM007; 1 Black Samsung digital camera;
8. TB0001; 1 Black Dell Laptop (serial #JW2YZP1);
9. TB0002; 1 Black "Blackberry" cell phone (Virgin Mobile);
10. TB0003; 1 Purple "Blackberry" cell phone (Sprint);
11. TB0004; 1 Black "AT&T" Sierra wireless modem.

Def. Ex.102 ("2012 Search Warr.") at 1. The items sought included, but were not limited to, the

following:

OPINION & ORDER – 20

documentation or records pertaining to the operations of the business of
prostitution, such as contact lists, names of johns/clients/tricks, addresses,
phone/pager numbers, text messages, incoming and outgoing call lists, emails to
and from johns/clients, instant messages, pictures, picture messages, video
recordings, and any other documentation of information
and records that would show evidence of or information concerning the
commission of the crimes of Oregon Revised Statutes (ORS) 167.017:
Compelling Prostitution; ORS 167.012: Promoting Prostitution; and ORS
167.007: Prostitution.

Id. Finally, Judge Daily directed law enforcement to

[p]resent those items associated with computers to law enforcement sworn
computer technicians, or their designee, for their examination and their analysis of
those items; and seize and reproduce the results of the search of those items for
my analysis.

Id. at 2.

Detective Martinez's affidavit contained significant evidence of criminal activity and
established ample probable cause for the search warrant. He summarized the encounter at the
Hampton Inn. 2012 Search Warr. Aff. at 2–6. He described what he learned from T.H. about
Ford and Prinster's alleged prostitution activities through multiple interviews, including how the
pair had recruited T.H. through promises of a modeling contract, set up "meetings" with
unknown men in hotels, and told her she had to participate in sex acts with client to prove her
"loyalty" to Ford. Detective Martinez wrote that T.H. told him Ford taken control of her car
through a ruse, had slapped and raped her, and that T.H. feared him. Id. at 5, 8.

Detective Martinez's affidavit also established sufficient reason to search Ford's
computer and electronic devices because a "reasonable inference from the affidavit's facts
suggested that incriminating evidence . . . related to the crimes under investigation would likely
be located there." Chavez-Miranda, 306 F.3d at 978. Detective Martinez wrote that T.H. and
Ford communicated by email, text messaging, and social media. 2012 Search Warr. Aff. at 2–6.

OPINION & ORDER – 21

T.H. told him that Ford took erotic and nude photographs of her, and that she believed they were stored on Ford's computer. Id. at 4. Detective Martinez told Judge Dailey that he had discovered, through his own research, online escort advertisements featuring Prinster and T.H. Id. at 11. He wrote that, based on his training and experience investigating sex trafficking crimes, that traffickers and prostitutes often keep records of their criminal activity (such as dates, locations, customers, posted ads and drafts of future ads, and photographs) on computers, hard drives, and other electronic devices. Id. at 11–12. Detective Martinez also wrote that, based on his training and experience, individuals engaged in prostitution often use cell phones to conduct business, including arranging dates and posting ads, or taking, storing, and sharing photos and videos. Id. at 13. These facts establish the required "reasonable nexus" between Ford's alleged criminal activity—compelling prostitution—and the items searched—Ford's computer.[6] United States v. Crews, 502 F.3d 1130, 1136–37 (9th Cir. 2007) ("For probable cause, an affidavit must establish a reasonable nexus between the crime or evidence and the location to be searched.").

**B. Scope of the 2012 Warrant; Search Protocols**

Next, Ford argues that all evidence derived from the 2012 search warrant must be suppressed because agents exceed the scope of their lawful authority in searching his digital devices and media. Def. Mot. to Supp. II at 18.  Essentially, Ford characterizes the 2012 search warrant as an illegal "general warrant" that allowed officers to indiscriminately comb his electronic devices. He asserts that the warrant should have included specific electronic media search protocols, such as the Ninth Circuit described in United States v. Comprehensive Drug Testing, Inc., to protect against "over seizing data and personal information non-responsive to a

---

[6] As explained above, Ford only establishing standing to challenge the seizure of his personal computer as a separate closed container. However, even if Ford had standing for all the seized items, the alleged facts establish a reasonable nexus for searching them. It is reasonable to connect text messages to phones, and photographs to camera and external media storage devices. Crews, 502 F.3d at 1137  ("It need only be reasonable to seek the evidence at the location indicated in the affidavit.").

warrant." 621 F.3d 1162, 1179 (9th Cir. 2010) (J. Kozinski, concurring) (hereinafter <u>CDT III</u>).[7] Ford's arguments are unavailing.

First, The <u>CDT III</u> electronic search protocols, while helpful, are not required in every case. <u>United States v. Hill</u>, 459 F.3d 966, 978 (9th Cir. 2006) ("we look favorably upon the inclusion of a search protocol; but its absence is not fatal."). The Ninth Circuit has repeatedly declined to "require warrants for digital storage media to specify a search protocol for the government to follow." <u>United States v. Storm</u>, No. 3:11-CR-00373-SI, 2012 WL 3643845, at *9 (D. Or. Aug. 23, 2012) (citing <u>United States v. Giberson</u>, 527 F.3d 882, 889–90 (9th Cir. 2008); <u>Hill</u>, 459 F.3d at 978; <u>United States v. Adjani</u>, 452 F.3d 1140, 1150 (9th Cir. 2006); <u>see also</u> <u>United States v. Schesso</u>, 730 F.3d 1040, 1043 (9th Cir. 2013) ("The absence of precautionary search protocols, suggested as guidance in the plurality's concurring opinion in <u>CDT III</u>, was not fatal here."). Even searches that "over-seize" digital materials do not necessarily violate the Fourth Amendment. <u>See</u> <u>United States v. Flores</u>, 802 F.3d 1028, 1044–45 (9th Cir. 2015) ("Over-seizing is an accepted reality in electronic searching because "[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.") (citing <u>CDT III</u>, 621 F.3d at 1176, 1177).

"Searches of electronic records pose unique challenges for striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures." <u>Schesso</u>, 730 F.3d at 1042. But specific protocols for every search of electronic devices are unnecessary because even without them, "the officer is always limited by the longstanding principle that a duly issued warrant . . . may not be used to engage in

---

[7] The <u>CDT III</u> protocols include protections such as using a third party to segregate pre-search data, waiving reliance on the plain view doctrine, and specific instructions to return or destroy non-responsive items. 621 F.3d at 1180.

a general, exploratory search." <u>Hill</u>, 459 F.3d at 978 (internal quotation marks omitted); <u>see also</u> <u>CDT III</u>, 621 F.3d at 1178 (J. Kozinski, concurring) ("District and magistrate judges must exercise their independent judgment in every case, but heeding this guidance [by including in the warrant the suggested protocols] will significantly increase the likelihood that the searches and seizures of electronic storage that they authorize will be deemed reasonable and lawful.").

Detective Martinez's affidavit describes how "pimps and prostitutes often maintain records of their prostitution enterprise which pertain to dates, locations, names of customers," and that such files are often stored with random file names or are otherwise concealed. 2012 Search Warr. Aff. at 11–12. The affidavit also describes how cell phones (especially those with cameras), cameras, and external storage devices are tools of prostitution. <u>Id.</u> at 13. The affidavit disclosed information from T.H. that Ford had nude pictures of her on his phone and laptop, that Prinster maintained a website, that Ford and Prinster communicated by email, social media, and text message, and that the officer found postings related to Ms. Prinster and T.H. on internet message boards. Thus, all of Ford and Prinster's seized electronic and internet capable devices are suspect. <u>See</u> <u>Schesso</u>, 730 F.3d at 1045 (extensive evidence of computer use, including storing pictures, using email, and hiding documents, in committing a crime gave "probable cause to search [the defendant's] entire computer system and his digital storage devices for any evidence" of the crime). Moreover, since the devices were in Ford's possession at the time they were seized, there is less risk over seizing data from third parties, one of the primary concerns driving <u>CDT III</u>'s suggested protocols. 621 F.3d at 1166.

Finally, the Court finds the warrants in this case were sufficiently particular. The Warrant Clause of the Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and the persons or things to be

seized." U.S. Const. amend. IV. The description in the warrant must be specific enough to guide the executing officer as to which items to search or seize. See Marron v. United States, 275 U.S. 192, 196 (1927). The "manifest purpose of this particularity requirement" is to prevent "wide-ranging exploratory searches" by "limiting the authorization to search to the specific areas and things for which there is probable cause to search." Maryland v. Garrison, 480 U.S. 79, 84 (1987).

The Ninth Circuit has developed the following three-factor test to determine whether a warrant is sufficiently precise:

(1) whether probable cause exists to seize all items of a particular type described in the warrant,
(2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and
(3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

United States v. Vasquez, 654 F.3d 880, 884 (9th Cir. 2011) (quoting United States v. Stubbs, 873 F.2d 210, 211 (9th Cir.1989)); see also Hill, 459 F.3d at 973 (describing similar factors). The level of specificity required depends on what is reasonable given "the circumstances of the case and the type of items involved." Hill, 459 F.3d at 973 (quoting United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986)); see also id. at 974 ("As always under the Fourth Amendment, the standard is reasonableness.").

As explained above, there was probable cause to seize all of the items listed in the 2012 warrant. The warrant directed officers to look in Ford's electronic devices for items related to operating a prostitution business, such as client lists, text messages, call lists, emails, pictures, and videos. And it directed officers to have experts examine the computers. Given the alleged facts in Detective Martinez's affidavit, the resulting search warrant is reasonably particular.

### C.  Whether 2012 Warrant Complied with State Law

Ford argues that evidence found pursuant to the 2012 warrant should be suppressed because the warrant failed to comply with Oregon state law by not including a date by which the warrant had to be executed, and officers failed to execute the warrant within ten days after securing it. Def. Mot. to Supp. II at 16–17 (citing Or. Rev. Stat. § ("ORS") 133.565). Technical violations of ORS 133.565 do not, however, require suppression of evidence obtained pursuant to an otherwise lawful warrant. ORS 136.432 ("A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by . . . [t]he United States Constitution or the Oregon Constitution[.]"). Moreover, it is well-settled "that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law." United States v. Cormier, 220 F.3d 1103, 1111 (9th Cir. 2000); see also Virginia v. Moore, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law."). The Court finds no violation of the Fourth Amendment here and thus suppression is not warranted.[8]

### D.  Good Faith Exception

Finally, even if the 2012 warrant was deficient, evidence found pursuant to it would not be suppressed because the officers here acted in good faith. Under the good faith exception, evidence obtained pursuant to a search under a warrant lacking probable cause is not suppressed if the officer acts in objectively reasonable reliance on the warrant. United States v. Patton, No. 3:12-CR-00652-KI, 2013 WL 5223649, at *13 (D. Or. Sept. 16, 2013) (citing United States v.

---

[8] Ford also asserts that the Government has held his property for too long. Def. Mot. to Supp. II at 25. The Court has already addressed this issue. Because the Government has stated it intends to introduce the phone or phones into evidence at trial, the phones retain evidentiary value and the Court will not order them returned to Ford.

Underwood, 725 F.3d 1076, 1085 (9th Cir. 2013)). There are four situations that *per se* fail to satisfy the good faith exception:

1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge;
2) where the judge wholly abandons his or her judicial role;
3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
4) where the warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

Underwood, 725 F.3d at 1085 (citing United States v. Leon, 468 U.S. 897, 922 (1984)).

None of those apply here. Ford does not allege facts regarding either the first or second situation above. The affidavit established considerably more than a "colorable argument for probable cause," and officers acted reasonably in relying on the 2012 search warrant. See Crews, 502 F.3d at 1136 (explaining that "[f]or the good faith reliance exception to apply, the officers must have relied on the search warrant in an objectively reasonable manner [and] [t]he affidavit must establish at least a colorable argument for probable cause.") (internal quotation and citations omitted). Thus, the good faith exception applies.

## IV.    Void for Vagueness

Ford also moves to dismiss Counts I-III of the indictment because the charging statute, 18 U.S.C. § 1951 is unconstitutionally vague. Def. Void for Vagueness Mot. at 1, ECF 173. The statute reads as follows:

(a) Whoever knowingly--
    (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

OPINION & ORDER – 27

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591. Ford argues that the statute is unconstitutionally vague because it "fails to define [the] key concepts" of force and fraud, and also "predicat[es] the offense on a person's prospective future conduct." Def. Void for Vagueness Mot. at 7.

"A criminal statute is void for vagueness if it is not sufficiently clear to provide guidance to citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement." United States v. Harris, 705 F.3d 929, 932 (9th Cir. 2013) (citation and quotation marks omitted). Vagueness challenges are either facial or as-applied. "In a facial challenge, a statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." Id. (quoting United States v. Kilbride, 584 F.3d 1240, 1257 (9th Cir. 2009). In an as-applied challenge, a statute is unconstitutionally vague if it "fail[s] to put a defendant on notice that his conduct was criminal." Id.

Although his motion does not state as much, Ford raises a facial challenge to the statute. He starts with a brief legislative history. Def. Void for Vagueness Mot. at 2–3. Ford then notes that while the statute defines terms such as "coercion" and "serious harm," it does not define the words "force" or "fraud." Id. at 4. Ford argues that these undefined terms are unconstitutionally vague because it is impossible "to determine the requisite amount of force or fraud needed to be

convicted under this statute." Id. at 6. Then, Ford asserts that to be convicted under 18 U.S.C. §
1951, "an individual must know or have reckless disregard that force, fraud, or coercion *will be
used* to effectuate" a commercial sex act. Id. at 4. These broad attacks on the statutory language
are obviously a facial challenge; Ford does not mention any facts to his case that would support
an as-applied analysis.

Given the procedural posture of this case, Ford's void for vagueness motion is denied,
without prejudice to refiling. "[V]agueness challenges to statutes which do not involve First
Amendment freedoms must be examined in the light of the facts of the case at hand." Harris, 705
F.3d at 932 (quoting United States v. Mazurie, 419 U.S. 544, 550 (1975)); United States v.
Rodriguez, 360 F.3d 949, 953 (9th Cir. 2004) ("Where, as here, a statute is challenged as
unconstitutionally vague in a cause of action not involving the First Amendment, we do not
consider whether the statute is unconstitutional on its face. Rather, we must determine "whether
the statute is impermissibly vague *in the circumstances of this case.*") (citing United States v.
Purdy, 264 F.3d 809, 811 (9th Cir. 2004)); see also Vill. of Hoffman Estates v. Flipside,
Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) ("One to whose conduct a statute clearly applies
may not successfully challenge it for vagueness. The rationale is evident: to sustain such a
challenge, the complainant must prove that the enactment is vague not in the sense that it
requires a person to conform his conduct to an imprecise but comprehensible normative standard,
but rather in the sense that no standard of conduct is specified at all.").

An implicit requirement of this test is that it must be clear what the defendant did. See
Ocegueda, 564 F.2d at 1365 ("It is now established, however, that in cases not involving First
Amendment claims a court may only consider a vagueness challenge on the *facts of the case
before it.*") (emphasis added). In other words, Ford must wait to bring an as-applied vagueness

challenge until the facts have been established by evidence introduced and trial and the fact-finder has had an opportunity to weigh in. <u>U.S. v. Reed</u>, 114 F.3d 1067 (7th Cir. 1997) (holding that district court erred in construing defendant's facial vagueness challenge as an as-applied one, and further erred by ruling on the motion before trial); <u>United States v. Reyes</u>, No. CR06-00556CRB, 2007 WL 831808, at *8 (N.D. Cal. Mar. 16, 2007) ("Without reference to any proof of what Defendants' conduct actually was, however, it is impossible to determine whether the statute provided sufficient notice that it prohibited the scheme of conduct in which they actually engaged. For this reason, the Court finds that Defendants' as-applied constitutional challenge to § 1346 is also premature, and denies the motion to dismiss for vagueness without prejudice. Defendants may, of course, renew their arguments following the presentation of evidence at trial.").[9]

//

//

//

---

[9] <u>See also</u> <u>United States v. Awad</u>, No. CR 15-78 (SRN/BRT), 2016 WL 492146, at *3 (D. Minn. Jan. 19, 2016) ("[T]he defendants' as-applied vagueness challenge is premature because it hinges on a number of factual disputes to be resolved at trial . . . ."); <u>United States v. Harris</u>, No. CR 09-10243-MLW, 2012 WL 2402788, at *3 (D. Mass. June 26, 2012) ("As indicated earlier, because the void for vagueness doctrine must be applied to the facts of this case, the court found defendant's motion to dismiss the indictment before trial on the ground of unconstitutional vagueness to be premature."); <u>United States v. Coffman</u>, No. 09-CR-181-KKC, 2010 WL 4510976, at *2 (E.D. Ky. Nov. 1, 2010) ("[T]he Court finds that it cannot determine whether the money laundering statutes are void for vagueness as applied to the Defendant until the Government puts on its case-in-chief. Thus, the Court will deny as premature the Defendant's argument that the money laundering statutes are void for vagueness."); <u>United States v. Dillon</u>, No. 06-05051-CRSWDW, 2007 WL 715263, at *2 (W.D. Mo. Mar. 6, 2007) (same); <u>United States v. Caputo</u>, 288 F. Supp. 2d 912, 917 (N.D. Ill. 2003) (" 'As-applied' review requires a court to review the specific facts in the case to determine if a reasonable person in Defendants' position would have been on notice that their conduct was at risk. These types of factual determinations are not appropriately determined by a court in a pretrial motion. Accordingly, Defendants' motion to dismiss on these grounds is denied as premature."); <u>United States v. Anderson</u>, No. 98-20030-01/07-JWL, 1999 WL 79654, at *6 (D. Kan. Jan. 19, 1999) (same); <u>United States v. Medina</u>, No. 91 CR. 894 (JFK), 1992 WL 27082, at *1 (S.D.N.Y. Feb. 6, 1992) ("Because the facts as to the cocaine in this case have not yet been established, defendants' motion is premature.").

**V.      Motion for Dismissal or a Bill of Particulars**

Ford seeks to dismiss the second superseding indictment in its entirety because, Ford argues, the indictment lacks specificity and fails to provide an adequate description of the charges against him such that he can prepare a defense. Def. Mot. for Dismissal at 1–2, ECF 160.

The Sixth Amendment to United States Constitution requires that a defendant be informed of the "nature and cause of the accusation against him," and the Federal Rules of Criminal Procedure reflect that requirement. FED. R. CRIM. P. 7(c) (requiring that an indictment be a "plain, concise and definite written statement of the essential facts constituting the offense charged."). "An 'indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.' " United States v. Davis, 336 F.3d 920, 922 (9th Cir. 2003) (quoting United States v. Bailey, 444 U.S. 394, 414 (1980)). Generally, where "the indictment tracks the words of the statute charging the offense, the indictment will be held sufficient so long as the words unambiguously set forth all elements necessary to constitute the offense." Id. (internal quotation marks omitted).

The second superseding indictment is sufficiently specific because it "adequately alleges the elements of the offense and fairly informs the defendant of the charge." United States v. Blinder, 10 F.3d 1468, 1471 (9th Cir. 1993). Each count states the elements of the offense, and precisely tracks the statutory language. Each count informs Ford of the nature of his changes, and what he is alleged to have done, with whom, when, and where. Second Superseding Indictment, ECF 103. Ford's motion to dismiss the indictment is, therefore, denied.

Alternatively, Ford seeks a bill of particulars in regards to Counts I-III. Def. Mot. for

Dismissal at 4–5. The purposes of a bill of particulars are threefold: "[T]o inform the defendant

of the nature of the charge against him with sufficient precision to enable him to prepare for trial,

to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his

acquittal or conviction in bar of another prosecution for the same offense when the indictment

itself is too vague, and indefinite for such purposes." United States v. Montgomery, No. 06-CR-

324-BR, 2007 WL 2688124, at *16 (D. Or. Sept. 10, 2007) (quoting United States v. Ayers, 924

F.2d 1468, 1483 (9th Cir. 1991). "In determining if a bill of particulars should be ordered in a

specific case, a court should consider whether the defendant has been advised adequately of the

charges through the indictment and all other disclosures made by the government." United States

v. Long, 706 F.2d 1044, 1054 (9th Cir. 1983) (citation omitted).

The second superseding indictment and the government's indexed discovery disclosures

are sufficient to meet the objectives of a bill of particulars noted above. See Gov't Resp. to Def.

Mot. for Dismissal at 6–7 (providing detailed description of discovery materials disclosed to

date, and explaining their significance to the Government's case). Accordingly, Ford's motion

for a bill of particulars is denied.

## VI.    Motion for Early Production of Jencks Act Materials

Through this motion, Ford seeks an order "directing the government to produce for

defendant's use in . . . trial preparation all grand jury testimony taken herein, regardless of

whether the particular witness or witnesses will be called to testify at trial." Def. Mot. for Jenks

Material at 1–2, ECF 161. The Government responds that it "has provided, and will continue to

provide, defendant with pretrial discovery in accordance with" Brady v. Maryland, 373 U.S. 83

(1963), and the Jencks Act. Gov't Resp. at 1–2, ECF 174. The Government asserts that has

provided Ford's team with "investigator reports of witness statements obtained to date" which "contain the statements made by each witness in each interview, and that such production is "beyond that which the government is technically required to produce" even after a witness testifies at trial. Def. Resp. at 3. Finally, the Government states that it has not turned over any grand jury testimony yet, and offers to do so two weeks before trial.

Ford's motion for immediate production of grand jury testimony is denied. United States v. Murray, 751 F.2d 1528, 1533 (9th Cir. 1985) (noting that discovery matters are within the sound discretion of the trial court). Ford has not made the required showing of "particularized and compelling need" for the grand jury testimony that outweighs the policy of keeping such testimony secret. In re Grand Jury Investigation No. 78-184, 642 F.2d 1184, 1191 (9th Cir. 1981) ("A court should not order disclosure in violation of the traditional grand jury secrecy except upon a showing of particularized and compelling need.") (citations and quotation marks omitted). The Court adopts the Government's proposal and thus the Government shall produce the grand jury transcripts two weeks prior to trial.

//

//

//

//

//

//

//

//

//

CONCLUSION

Ford's motion to suppress for lack of probable cause [167] is denied. Ford's motion to

suppress evidence pursuant to search warrants [164] is denied. Ford's void for vagueness motion

[173] is denied without prejudice. Ford's motion to dismiss or for a bill of particulars [160] is

denied. Finally, Ford's motion for immediate production of Jencks Act materials [161] is denied,

but the Government is hereby ordered to disclose the requested materials three weeks before

trial.

IT IS SO ORDERED

Dated this _____ day of _____, 2016.

MARCO A. HERNÁNDEZ
United States District Judge