IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                    Plaintiff,

      v.

TAQUARIUS KAREAM FORD,

                  Defendant.

No. 3:14-cr-00045-HZ

OPINION & ORDER

Leah K. Bolstad
United States Attorney's Office, District of Oregon
1000 SW Third Ave., Ste. 600
Portland, OR 97204

Glen H. Ujifusa
Multnomah County District Attorney's Office
600 Multnomah County Courthouse
1021 SW 4th Ave.
Portland, OR 97204

      Attorneys for Plaintiff

//

1 – OPINION & ORDER

Laurie Bender
Laurie Bender, PC
735 SW Fifth Avenue
2nd Floor
Portland, OR 97204

      Attorney for Defendant

HERNÁNDEZ, District Judge:

      Defendant Taquarius Ford is a black male is charged with three counts related to his alleged involvement in sex trafficking, including two counts of sex trafficking by force, fraud, and coercion. Ford believes his charges result from the selective enforcement and prosecution of black males for sex trafficking in the District of Oregon. Ford moves the Court for an order directing the United States Attorney's Office and its agents to disclose and produce materials, documents, and information related to the enforcement and prosecution of federal and state sex trafficking and prostitution offenses. Ford offers statistics and other information about disparate prosecution and sentencing of black males for all crimes generally, and specific information regarding sex trafficking prosecutions in Oregon. But none of this information is enough to entitle Ford to discovery on his claim. The Supreme Court set a clear standard for such discovery in <u>United States v. Armstrong</u>, and because Ford has not shown some evidence of discriminatory effect or discriminatory intent on the part of law enforcement or the United States Attorney's Office, his motion is denied.

BACKGROUND

      Ford is charged with three counts of sex trafficking and conspiracy charges alleging force, fraud, and coercion in violation of 18 USC §§1591(a)(1) and (b)(1) and §§1594(a) and (c). Ford is also charged with Obstruction of the Enforcement of 18 USC §1591(d), and Tampering with a Witness, Victim or Informant under 18 USC §§1512(b)(1) and 1512(b)(3). There is also a

2 – OPINION & ORDER

criminal forfeiture allegation. Ford's Co-defendant Konia Prinster, a white female, is a cooperating witness.

Ford contends the requested discovery will show that he and black males in general, are not only prosecuted far more often under felony sex trafficking statutes, but also that similarly situated non-black, non-male persons are either not targeted at all or are prosecuted under statutes and plea agreements that do not impose lengthy or mandatory minimum sentences. Specifically, Ford alleges that "law enforcement and the Government selectively targeted, arrested, charged, convicted, and sentenced black males for serious sex trafficking charges, while typically giving the white male buyer, white female prostitute or 'madam,' and, to a far lesser extent, black female prostitute and or 'madam,' arrestees diversion with dismissals, rehabilitation, and/or, in the more egregious cases, probation." Memorandum in Support of Motion for Discovery on the Issue of Racial Profiling and Selective Enforcement and/or Prosecution at 10 ("Def. Memo."), ECF 170.

## STANDARD

As delegates of the Executive, enforcement and prosecution of the nation's criminal laws rest on the discretion of United States Attorneys. United States v. Armstrong, 517 U.S. 456, 464 (1996). A United States Attorney violates the Constitution by charging a defendant based on "an unjustifiable standard such as race, religion, or other arbitrary classification." Oyler v. Boles, 368 U.S. 448, 456 (1962). "[I]n the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." United States v. Chemical Foundation, Inc., 272 U.S. 1, 14–15 (1926). To allow discovery for a selective prosecution claim is to "exercise judicial power over a special province of the Executive." Armstrong, 517 U.S. at 464 (citing Heckler v. Chaney, 470 U.S. 821, 832 (1985)) (internal quotations omitted).

The standard controlling a motion seeking discovery for a selective prosecution or enforcement claim is not found in the Federal Rules. Specifically, Rule 16 of the Federal Rules of Criminal Procedure is not applicable in such motions because Rule 16 only applies to discovery of documents that are "material to the preparation of the . . . defense" or "intended for use by the government as evidence in chief . . . ." Armstrong, 517 U.S. at 462. "[A] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." Id. at 463.

For a selective-prosecution claim to succeed on the merits, a defendant must show (1) discriminatory effect and (2) discriminatory purpose or intent. Id. at 465. On the first element, Armstrong also requires evidence of similarly situated persons being treated differently. Id. at 470. This is necessary to balance "the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." Id.

The "rigorous standard for the elements of a selective-prosecution claim [] require a correspondingly rigorous standard for discovery in aid of such a claim." Id. Thus, to win a motion for discovery, a defendant must produce "some evidence tending to show the existence of the essential elements of the defense," which include both "discriminatory effect and discriminatory intent." Id.[1]

//

---

[1] Defendant attempts to avoid Armstrong and argues that discovery is proper when the "defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose." Def. Memo at 14 (citing United States v. Falk, 479 F.2d 616, 620–621 (7th Cir. 1973)). Falk does not control here for a number of reasons. First, Armstrong is a Supreme Court case; Falk is a Seventh Circuit case which pre-dates Armstrong by over two decades. Second, Armstrong directly addressed the question here, and it does so in the opinion's opening sentence: "In this case we consider the showing necessary for a defendant to be entitled to discovery on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race." Armstrong, 517 U.S. at 458.

DISCUSSION

## I. Discriminatory Effect

"To meet the first requirement, of discriminatory effect, [defendant] must show that similarly situated individuals of a different ethnic origin were not prosecuted." United States v. Arenas-Ortiz, 339 F.3d 1066, 1068 (9th Cir. 2003) (internal quotations omitted); see also Armstrong, 517 U.S. at 464–465 (to "dispel the presumption that a prosecutor has not violated equal protection" there is an absolute requirement of showing "clear evidence" that similarly situated individuals of other races could have been prosecuted but were not). Armstrong recognized this as a high burden, but "if the claim of selective prosecution [is] well founded, it should not [be] an insuperable task to prove that persons of other races [are] being treated differently." Id. at 470.

### A. Statistics

Ford offers numerous statistics purporting to show that "law enforcement and the Government selectively targeted, arrested, charged, convicted, and sentenced black males . . . ." Def. Memo at 10. Ford presents a wide range of statistics, beginning with national statistics related to crime in general. Ford points out that 52.2% of country-wide death penalty defendants between 1972 and 2004 were black, and 31.5% of defendants convicted of crimes requiring mandatory minimum sentences in 2010 were black. Def. Memo. at 19, 20. Narrowing his focus, Ford then offers Oregon statistics relating to prosecutions of black males under a wide variety of criminal statutes, with brief attention paid to sex trafficking specifically. Ford notes that 85% of federally indicted sex trafficking defendants in Oregon between 2009 and 2015 were black, and (from an admittedly small sample of 16 individuals) 93.75% of sex trafficking defendants in Multnomah County between 2010 and 2014 were black. Id. at 32, 35. These statistics do not

show whether, in the District of Oregon, black males are selectively prosecuted for sex trafficking.

It is well-established that statistical evidence of racial disparity is insufficient to establish any element of a discrimination claim. See, e.g., Armstrong, 517 U.S. at 459–460 (holding that statistical evidence showing 24 out of 24 crack cocaine defendants were black was not enough to infer selective-prosecution); United States v. Hare, No. 14-4758, 14-4770, 14-4832, 2016 WL 1567051, at *4 (4th Cir. Apr. 19, 2016) (statistics showing 32 out of 32 black defendants in stash house stings "[did] not meet Armstrong's discovery standard"); Arenas-Ortiz, 339 F.3d at 1069 (use of statistics to establish discriminatory effect under Armstrong deemed "fatally flawed"). As the Government succinctly responds, "[a]t best, defendant['s] race-based case numbers reveal that [the Oregon USAO] has prosecuted more black sex traffickers than white sex traffickers and more men than women." Govn't Resp. at 8, ECF 180.

Ford relies heavily on United States v. Davis to argue that statistical data alone could meet the "some evidence" requirement of Armstrong. The defendants in Davis sought discovery related to "stash house" stings. United States v. Davis, 793 F.3d 712, 714 (7th Cir. 2015). The defendants noted that of 20 stash house stings prosecuted, 75 defendants were black, 13 were Hispanic, and 6 were white. Id. at 715. The district court judge granted the discovery motion, holding that "the prosecution . . . has brought at least twenty purported phony stash house cases, with the overwhelming majority of defendants named being individuals of color. In light of this information, it is necessary to permit [d]efendants discovery . . . ." Id. The request was broad and included, among other information, a decade's worth of race data for every defendant investigated or prosecuted in stash house stings, all national and local law enforcement materials

relating to protocols for stash house stings, all instructions from the U.S. Attorney to prosecutors relating to race's role (or lack thereof) in prosecutions, and much more. Id. at 721.

Ford characterizes Davis as allowing discovery where "the defendants only had statistical evidence," and "curtail[ing] but uph[olding]" that discovery on appeal. Def. Memo. at 16. The Seventh Circuit, however, did much more than that. The panel deemed the discovery request "vastly overbroad," and held that discovery pertaining to the exercise of prosecutorial discretion was "blocked by Armstrong." Davis, 793 F.3d at 722. Only then did the court clarify that "some of the discovery [asking for] information from supervisors or case agents of the FBI and ATF . . . is outside the scope of Armstrong," and could potentially be discoverable. Id.  The Davis panel then remanded to the district court to examine the defendant's alleged "additional evidence" and to determine whether to grant the motion:

> [I]t remains possible that [law enforcement] would not have pursued this investigation had Davis been white. Defendants contend they have additional evidence (beyond that presented to the district court) that could support such a conclusion. The judge should receive this evidence and then decide whether to make limited inquiries, perhaps including *affidavits or testimony of the case agents*, to determine whether forbidden selectivity occurred or plausibly could have occurred. If not, there *would be no basis to attribute this prosecution to the defendant's race.*

Davis, at 723 (emphasis added).

Here, the Government has already provided Davis's suggested "additional" evidence, which shows that Ford was not unconstitutionally targeted. First, FBI Task Force Officer Yonsoo Lee, an investigator assigned to the Child Exploitation Task Force, explains in his affidavit that "human trafficking investigations are predicated upon the identification of the *victim*." Lee Decl. ¶6, ECF 180-1 (emphasis added). The way in which sex trafficking investigations unfold is distinguishable from "drug sting" cases like Davis. In drug stings, the officers know their target

before the investigation begins. By contrast, in sex trafficking cases like Ford's, officers have no prior knowledge of either the victim or the trafficker. This "double blind" nature puts sex trafficking investigations in a uniquely insulated position. The race or gender of either the victim or the sex trafficker is unknown, and it is implausible to assume that law enforcement targets an individual based on such characteristics. Officer Lee confirmed this "double blind" method applied to all of the sex trafficking cases he has investigated, including Ford's. Id.

Further, AUSA Bolstad stated that she had prosecuted "all kinds of individuals for sex trafficking charges, including male and female defendants, and defendants from several different races including Caucasian, Hispanic, and African-American." Bolstad Decl. ¶4, ECF 180-2. Special Assistant U.S. Attorney Ujifusa as well as Assistant U.S. Attorneys Jane Shoemaker and Scott Kerin all offer the same explanations. Ujifua Decl., ECF 180-3, Shoemaker Decl., ECF 180-4, Kerin Decl., ECF 180-5.

Finally, allowing a defendant discovery based solely on such statistics could create a situation where a prosecutor does not pursue a meritorious charge against a minority defendant for the sole reason of avoiding a statistical anomaly.

Ford presents emotionally compelling statistical data pointing to disproportionate treatment of black males by law enforcement and the criminal justice system. However, there are many reasons why statistics turn out a certain way, and disparities in the racial breakdown of prosecutions for certain crimes are not necessarily indicative of constitutional violations. Armstrong is clear: statistics alone are not enough to support discovery in a selective prosecution claim.

//

//

**B. Similarly Situated Individuals**

"[A] credible showing of different treatment of similarly situated persons" is a threshold

requirement to establish discriminatory effect. Armstrong, 517 U.S. at 470. For a defendant's

motion for discovery related to selective prosecution to succeed under Armstrong, the defendant

must produce some evidence that similarly situated individuals of other races or genders could

have been prosecuted but were not. Id. "[D]efendants are similarly situated when their

circumstances present no distinguishable legitimate prosecutorial factors that might justify

making different prosecutorial decisions with respect to them." United States v. Olvis, 97 F.3d

739, 744 (4th Cir. 1996) (finding black defendants were not similarly situated to white

individuals who were arrested for the same crime but not indicted, based on mitigating factors).

Ford offers several groups as similarly situated, but they all miss the mark. First, Ford

claims that buyers of commercial sex, predominantly white "Johns," are similarly situated to sex

traffickers in general. Def. Memo. at 50. Second, Ford points to female sex traffickers and claims

that they are treated differently based on gender because the government will invariably treat a

female sex trafficker as a "victim." Id. at 52. Ford finally claims that all persons who are part of

the "sexual subculture" (including owners of strip clubs, frequented hotels, and massage parlors,

among others) are similarly situated to sex traffickers. Id. at 53–54.

Ford's argument, however, fails to account for other legitimate factors related to a

charging decision. Such factors may include (1) requirements for charging different actors under

a particular statute, (2) the relative culpability of the parties, and (3) the facts specific to each

individual involved. See, 18 USC §1591; Olvis, 97 F.3d at 744; United States v. Redondo-

Lemos, 27 F.3d 439, 444 (9th Cir. 1994). Relying on a "raw comparison," as Ford has done here,

is improper because it fails to account for a defendant's "level of involvement, prior criminal

history, cooperation with the government, or individual circumstance." <u>Redondo-Lemos</u>, 27 F.3d at 444; <u>see also</u> <u>United States v. Aguilar</u>, 883 F.2d 662, 706 (9th Cir. 1989) ("The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination . . . . *If all other things are equal*, the prosecution of only those persons [to whom the factor applies] . . . gives rise to an inference of discrimination.") (emphasis added).

Ford claims "black males and their subculture are the face of the sex trafficking crackdown" while white buyers and other members of the "sexual subculture" are "all but forgotten in the panic to hyper-incarcerate black pimps." Def. Memo. at 39–41. Ford accurately points out that the federal statutes under which sex traffickers in Oregon are prosecuted (specifically §1591) make no distinction between suppliers of commercial sex and purchasers of commercial sex. <u>Id.</u> at 6. However, to prosecute a John and other members of the sexual "subculture," the Government must prove that the individual knew or should have known "that his prostitute was a child or that the adult prostitute was subject to coercion . . ." and that absent such proof, "a sex trafficking charge will not be sustainable." Govn't Resp. at 11. The knowledge of coercion required to bring a charge under this statute distinguishes Johns from an individual who coerces a victim into sex trafficking.

Much like the difference between drug users and drug traffickers, or child porn possessors versus child pornography producers, the relative culpability between a John and a sex trafficker is much different based on such criteria as infliction of harm on the victim, length of time of the interaction, levels of trust between the parties, as well as personal profit from the illegal act. <u>Id.</u> at 10–11. Without diminishing the harm a victim suffers from the purchase by a John, the level of culpability between a John and a sex trafficker is indeed different.

Finally, and perhaps most convincingly, the Government does prosecute Johns and females for sex trafficking, most notably Konia Prinster, the white female co-defendant in this case. See also United States v. Ben Riggs and Laura Lamden. 3:13-CR-00294-JO (criminal case against a female defendant that included a charge of sex trafficking a child). As Ford's memo acknowledges, there are other white males and females with charges for sex trafficking in the District of Oregon. Def. Memo at 32. These charges were brought by the very same United States Attorney Ford now accuses of selective prosecution.

Ford attempts to diminish the relevance of these prosecutions with examples of white males and females of all races who could have been prosecuted for violating the same federal statute he is charged under, but instead were charged under state or federal statutes that carry lesser punishments. Def. Memo. at 10. Ford fails to consider the numerous legitimate factors prosecutors must consider before deciding to charge a defendant, such as the strength of the evidence, the defendant's role in the crime, whether there is prosecution by state authorities, resources necessary for a conviction, impact on related investigations, prosecutorial priorities, and the defendant's candor and willingness to cooperate. Olvis, 97 F.3d at 744.

As a stark example, Ford's memo insinuates that Konia Prinster is facing lesser charges solely because she is white and female. However, Prinster chose to cooperate with law enforcement *after she was charged with the same crime* as Ford. See Olvis, 97 F.3d at 744 ("A prosecutor may . . . legitimately offer immunity to a potential defendant who is equally involved as others simply because that defendant may choose to cooperate . . . ."). Clearly, a cooperating witness is not similarly situated to Ford. Therefore, by his own admission, there are factors beyond race or gender that explain the different treatment afforded his co-defendant. Beyond a "raw comparison," Ford has not produced evidence showing a similarly situated individual could

have been charged under the federal sax trafficking statute but was not. and therefore does not

meet the threshold requirement for discovery. See Armstrong, 517 U.S. at 470.

### C. Qualitative Evidence

Finally, Ford offers what he calls "qualitative evidence" such as magazine and law

review articles, and the portrayal of black men in movies and literature, as evidence of

discriminatory effect. However, this type of "qualitative evidence" does not establish

discriminatory effect. Armstrong, 517 U.S. at 470. In Armstrong, the defendants attempted to use

newspaper articles about the racial disparity in drug prosecutions as evidence to support a request

for discovery. The Court held that "[t]he newspaper article, which discussed the discriminatory

effect of federal drug sentencing laws, was not relevant to an allegation of discrimination in

decisions to prosecute." Id.

Shortly after Armstrong, the Ninth Circuit analyzed a discovery motion for a selective

prosecution claim by defendants charged with distribution of crack cocaine. A memorandum to

the court referenced "newspaper articles and a National Public Radio report commenting on the

'racial divide' in crack cocaine prosecutions, and . . . a study [entitled] 'Preliminary Data on

Race and Crack Charging Practices in Los Angeles.' " United States v. Turner, 104 F.3d 1180,

1182 (9th Cir. 1996). The court noted such evidence was merely "anecdotes and hearsay" that

showed "no more than the consequences of the investigation in to violent street gangs, not that

they were targeted because of race." Id. at 1185.

Similarly, Ford presents "anecdotes and hearsay" that are not persuasive. Ford explores

the history of racism in Oregon with territorial statutes from the years 1844 and 1862,

information wholly irrelevant to the present motion. Def. Memo. at 23. Ford also references the

cover art for a Portland Monthly Magazine article about the sex trafficking crackdown

spearheaded by former United States Attorney Amanda Marshall, claiming the art itself contributes to the "mass delusion of black men as criminals." Def. Memo. at 38. The article in fact makes no mention of race at all, and it strains credibility to argue that the magazine's stylized illustration contributes to racial stereotypes that somehow lead to selective prosecution in sex trafficking cases.

### D. Showing "Some Evidence"

The weakness of Ford's evidence is particularly apparent when compared to a recent Northern District of California case, where the district court granted a motion for discovery on a claim of selective enforcement.[2] United States v. Mumphrey, No 14-cr-00643-EMC-1, 2016 WL 3548365, at *1 (N.D. Cal. July 30 2016). In Mumphrey, defendants were African Americans charged with relatively low level drug trafficking offenses. The law enforcement program that led to the arrest and prosecution of the defendants involved two "sweeps" of specifically targeted areas of the Tenderloin district in San Francisco. Id. The defendants had evidence that included San Francisco Police Department incident reports showing that officers had "participated in hundreds of buys[,] busts and surveillance of the area" and that based on "prior arrests and contacts," the race of drug dealers in specific geographic locations was well-known to the officers. Id. at *7. Significantly, the focus of the law enforcement activity was "on repeat offenders and/or known drug traffickers . . . ." Id. at *8. The defendants produced evidence of similarly situated persons that could have been targeted but were not, including, most notably, a video where an "undercover informant declines to buy drugs from an Asian woman and waits to buy drugs from the defendant, an African American woman." Id. at *7. There were also startlingly racist comments, texts, and actions by the officers, including another video where an officer says "[f]ucking BMs," referring to black males, and then is silenced when an officer

---

[2] Discovery for the defendant's selective prosecution claim was denied.

13 – OPINION & ORDER

reminds him, "[s]hh, hey, I'm rolling." Id. This evidence, along with "conspicuously meager rebuttal by the government . . . ," allowed the court to conclude there was "substantial evidence suggestive of racially selective enforcement by [officers]." Id. at *1.

By contrast, Ford's heavy reliance on statistics pales in comparison to the shocking evidence present in Mumphrey. Here, the government has provided compelling and uncontroverted evidence which distinguishes the sex trafficking investigation in Ford's case, where his identity was unknown, and the drug stings in Mumphrey, where officers knew the racial identities of the defendants. Ford has no evidence that race played any role in his identification, arrest, or prosecution.

**II. Discriminatory Intent**

Even if Ford could meet the threshold showing of "some evidence" of discriminatory effect, he has not provided "some evidence" of discriminatory intent. Armstrong, 517 U.S. at 468. Discriminatory intent is found when "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979) (internal citations omitted). Further, an awareness of the consequence is not the same as having discriminatory intent. Turner, 104 F.3d at 1184.

The Government filed sworn declarations from law enforcement and prosecutors denying race or gender took any part in the decision to charge Ford. Bolstad Decl. ¶5; Lee Decl. ¶7; Ujifusa Decl. ¶13; Shoemaker Decl. ¶3; Kerin Decl. ¶3. This evidence strongly suggests a lack of discriminatory intent in this case, and it is clear that Ford has not met his burden. Turner, 104 F.3d at 1182, 1185 (reversing the district court's grant of discovery because "the [defendants]

offered no evidence whatsoever of an intent on the part of the prosecutors to prosecute them on account of their race, and the prosecutors and FBI have under oath denied such motivation.")

Even more compelling is the "double blind" nature of sex trafficking investigations. As mentioned above, the identity of the sex trafficker is not known at the start of an investigation. Rather, "the *victim's* discovery opens the case, and information she provides leads to a defendant's apprehension." Govn't Resp. at 6 (emphasis added). FBI agent Lee confirmed in his declaration, "I had no idea who the suspect in the case was until it was disclosed to me by the victim . . . ." Lee Decl. ¶6. Lee continues, "[i]n addition to my lack of prior knowledge regarding a *suspect's* race at the onset of my investigations, it is most frequently the case that I have no selective power over the identity or race of the victims . . . ." Id. (emphasis added). The victim in this case was not targeted. Ford was not targeted. There was no discriminatory intent.

## CONCLUSION

Because Ford has failed to produce some evidence of either (1) discriminatory effect or (2) discriminatory intent, his motion [ECF 169] for discovery related to selective prosecution or enforcement is denied.

IT IS SO ORDERED.

Dated this ____22____ day of ____August____, 2016.

MARCO A. HERNÁNDEZ
United States District Judge

15 – OPINION & ORDER